HUBBARD (PAGE v.). See Case No. 10,-663.

HUBBARD v. PROCEEDS OF THE KATE HINCHMAN. See Cases Nos. 7,620 and 7,621.

---

## Case No. 6,819.

HUBBARD v. TURNER et al.

[2 McLean, 519.] [1]

Circuit Court, D. Illinois. June Term, 1841.

EQUITY—PRACTICE—ANSWER—CROSSBILL—FRAUD—ASSIGNMENT OF MORTGAGE—RIGHTS OF ASSIGNOR AND ASSIGNEE—NOTICE—SETOFF.

1. Fraud must be clearly proved.

2. A mortgage assigned in payment of a debt is not held by the assignee subject to the claims of the creditors of the assignor.

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

3. Although there may be an equitable lien on the mortgaged premises, yet the assignee having no notice of it is not affected by it.

4. Generally the mortgagor may claim the same rights against the assignee of a mortgage as against the mortgagee.

5. If the mortgagor have a setoff or mutual credit against the mortgagee it is not affected by the assignment.

6. A payment made to the mortgagee, after the assignment but before the mortgagor has notice of it, is good against the assignee.

7. The statute of Illinois, however, places bonds and mortgages and every description of instrument, for the payment of money, or property on the same footing as bills of exchange.

8. Under the statute of Illinois a declaration of trust not recorded is inoperative.

[Cited in Oregon Trust Co. v. Shaw, Case No. 10,556.]

9. A mortgage on a large amount of property, for the payment of ninety thousand dollars, where but four thousand dollars were due to the mortgagees, is fraudulent, as against creditors. And these facts are sufficient for the exercise of an equitable jurisdiction.

10. It is not the English practice to set up a matter in the answer, which shall have the effect of a crossbill. And our practice is derived from that of the high court of chancery in England.

In equity.

Morris & Thomas, for complainant.
Mr. Butterfield, for defendants.

OPINION OF THE COURT. On the 19th April, 1836, the complainant for himself and others entered into two contracts with the defendant, Turner, for the sale of certain property in and near the city of Chicago, in this state. In one of the contracts the complainant, for himself and as attorney in fact for Samuel Russell, entered into a penal bond for the conveyance of certain lots in Chicago, to wit—for the consideration of eight thousand seven hundred and fifty dollars, the complainant in his own right sold to Turner lots seven and twelve, on the north side of the Chicago river, in Kinzie's addition to the original town plat. And as agent for Samuel Russell, for the consideration of twenty six thousand two hundred and fifty dollars, the complainant sold to Turner lots one, eleven and twelve, in block seventeen, and eleven and twelve, in block sixteen, ten and eleven, in block two, seven in block five, lying north of the river and within Kinzie's addition to the original town plat. Deeds with general warranty were to be made for the above lots on the payment to the complainant in his own right, and as attorney in fact for Russell, as follows: "Five thousand dollars down; the same amount by a draft on the Otsego Bank of New York, payable the first of June ensuing; and the residue of the purchase money, being twenty five thousand dollars, was to be paid in three equal instalments—in six, twelve, and eighteen months—for which three promissory notes were executed by Turner, payable to the order of the complainant." In the other contract a like penal bond was entered into by the complainant in his own right, and as attorney in fact for William H. Brown and William W. Saltonstall. The bond recited that the complainant had sold to the defendant, Turner, for the sum of seventeen thousand dollars, lots six, in block twenty nine, near the junction of the north and south branches of the Chicago river, within the original plat of the town; two, four, eight, twelve and sixteen, in the subdivision of block fourteen by Arthur Bronson. And, as agent for William H. Brown, for the consideration of thirty thousand dollars, the complainant sold to the defendant, Turner, one half of eighty acres, being the east half of the northeast quarter of section seventeen in said town, known as Duncan's addition to Chicago. And, as agent for Saltonstall, for the sum of seven thousand dollars, lot eight, in block forty four, within the original town plat.

Deeds of general warranty were to be made for the above on the payment to the complainant in his own right, and as agent for Brown and Saltonstall, ten thousand dollars down, seven thousand dollars on or before the twentieth of June next ensuing, fifteen thousand dollars on the twentieth of October ensuing, twelve thousand on the first of April ensuing, and the remaining ten thousand dollars, making in all the sum of fifty four thousand dollars, the nineteenth of October eighteen hundred and thirty seven. Four promissory notes were executed by Turner in accordance with the above agreement. On the same 19th April, 1836, the complainant entered into an agreement with the defendant, Turner, in which the lots purchased, amounting to fifty four thousand dollars, were recited in consideration of which, the sum of fifty dollars, and the per cent. commission and profit stated, did covenant with the defendant, his heirs and assigns, "to guaranty, warrant and insure to him, his heirs and assigns, that he and they shall realize and receive one hundred per cent. advance in eighteen months from that date from, and upon, said purchase money for all the property above mentioned, viz—upon the sum of fifty four thousand dollars." For this guaranty and insurance the defendant, Turner, his heirs, &c., agreed to pay to the complainant ten per cent. upon the amount which he or they should realize for the sale of the seven lots above stated, purchased for the sum of twenty four thousand dollars. And twenty per cent. upon the amount realized on the sale of the individual moiety of Duncan's addition, purchased at thirty thousand dollars. Turner, also, agreed to pay the complainant three thousand five hundred dollars; and, also, one half of all he should realize for the sale of the above lots, over one hundred and eight thousand dollars. And the defendant became bound not to sell any part of the above property for less than one hundred per cent. advance on the purchase money.

On the 6th July, 1837, the complainant,

and the defendant, Turner, entered into a new agreement which materially changed their former contracts. At this time the defendant had paid, including interest, the sum of forty five thousand two hundred and twenty six dollars on the fifty four thousand dollar contract, leaving the sum of ten thousand dollars only, with interest, unpaid; and which was not due until the nineteenth of October, ensuing. On the other purchase, of thirty five thousand dollars, there had been paid the sum of eighteen thousand six hundred and sixty two dollars, which included interest, leaving a note unpaid for eight thousand nine hundred and seventeen dollars fifteen cents, which was due the 19th of April preceding; and a note for nine thousand two hundred seven dollars and ninety five cents, which would fall due the 19th of October, ensuing. On both contracts the sum of sixty four thousand and eighty eight dollars seems to have been paid by Turner. And he was in default only for the payment due the 19th April, as above stated. Up to the time of the new arrangement, the principal matter in controversy between the parties, seems to be as to the effect of the contract of guaranty.

On the part of the complainant it is contended that under the guaranty, the defendant was bound to make the payments as they became due on both contracts; and having failed to do so, he can claim nothing under the guaranty. That the contract of guaranty was usurious and fraudulent, and consequently void. Whether the guaranty was usurious or fraudulent will hereafter be considered; but it is clear that it referred only to the fifty four thousand dollar contract. The property sold by that contract is named in the guaranty, and, also, the sum agreed to be paid; and in consideration of that purchase and the commissions allowed, on double the amount of the purchase money, the contract of guaranty was entered into. It had no reference to the other contract or to any payments to be made under it. So far then as regards the conditions of the guaranty, the defendant was in no default on the 6th July, 1837, when the new contract was made. The allegation in the bill that the payment of twelve thousand dollars was not made on the 1st April, 1837, when it became due, is denied by the answer, and is not sustained by the evidence. As to the terms of the new contract the bill and answer are at issue. Prior to this time it is admitted that no part of the property, specified in the fifty four thousand dollar contract, had been conveyed to Turner. The conditions of the guaranty contract were assumed, in part, as the basis of the compromise. Hubbard agreed to account to Turner for the sum of one hundred and eight thousand dollars, that being the amount of the fifty four thousand dollar purchase, and one hundred per cent. added thereto. To make up this sum, commissions were allowed and the premium of three thousand five hundred dollars, agreeably to the guaranty contract, which amounted to the sum of twenty thousand three hundred dollars. And conveyances were made to Turner of the Hubbard square and the Lake House property, in Chicago, for the consideration of fifty thousand dollars. A bond and mortgage were, also, executed by Hubbard for the payment of twenty six thousand seven hundred dollars, in five years, with interest. The aggregate of these amounts is the sum of ninety seven thousand dollars, leaving a balance of eleven thousand dollars due. And the parties differ as to the manner in which this balance was paid.

On the part of the complainant it is contended, that it was paid by an allowance of three thousand dollars for settling the guaranty before it was due, and the consideration of eight thousand dollars for fifteen acres of land near Peru. By Turner it is insisted the balance was paid by deducting the ten thousand dollar note and interest, due in October, 1837, on the fifty four thousand dollar contract. The defendant admits that by the compromise he agreed to pay the two notes unpaid, under the thirty five thousand dollar contract. As above stated, one of these notes was for the sum of eight thousand nine hundred seventeen dollars and thirty eight cents, which was due 19th April, 1837. The other was for the sum of nine thousand two hundred seven dollars and ninety five cents, payable the 19th October, 1837, making the aggregate sum of eighteen thousand one hundred twenty six dollars and thirty cents. From this sum the defendant states several sums were deducted, which, upon balances of accounts, &c., the complainant owed him, which reduced the amount due to the complainant under the compromise, to the sum of sixteen thousand three hundred eighty two dollars and twenty nine cents. And four drafts were drawn by Turner in favor of complainant on Huntington & Campbell and J. P. Huntington, of New York, amounting to this sum. But the complainant insists that, in addition to the two notes above specified, the defendant agreed to pay the ten thousand dollar note, which would fall due in October, under the fifty four thousand dollar contract. And it appears, at the time of the compromise, the defendant drew in favor of the complainant, on the Hon. Daniel Webster, for ten thousand dollars, payable in ninety days, at the Merchants' Bank in New York. But this draft the defendant insists was a loan to the plaintiff, and not a payment under the compromise. The complainant, also, alledges that, as a part of the consideration of the compromise, the defendant loaned him twenty thousand dollars, to be obtained from Mrs. Coultis, which were never obtained; and that in this, as also in his representations respecting the solvency of Huntington and Campbell, and the certainty of the drafts which he drew

on them, and on J. P. Huntington's being punctually paid, the defendant was guilty of fraud.

In this part of the case three inquiries seem to arise: First: Was the draft on Mr. Webster a loan? Second: In what manner was the sum of eleven thousand dollars paid, by the complainant, under the compromise? Third: Was Turner guilty of fraud as above charged?

The defendant, at the time he drew the draft on Mr. Webster, assigned to the complainant, as security for the payment of it, a mortgage given by Hugunin and Pearce for the payment of ten thousand dollars, in ten years from the 27th April, 1837. And Greenwood, a witness, who was the clerk of the complainant, at the time of the compromise, and who kept his books, swears that this draft was given in payment, under the compromise, and not as a loan. Without explanation the fact of security having been given for the payment of the draft would seem to imply, very strongly, that it was a payment and not a loan. But even in this view it would be somewhat singular that security for the payment of this draft only should be required. The explanation, however, is found by a reference to the conditions on which the assignment of the above mortgage was made. The instrument declares that the assignment of the mortgage was "to secure the following payment, and upon the following condition, viz: To secure the payment of a draft upon the Hon. Daniel Webster, &c., and upon this condition, that the said Hubbard shall execute, with his wife, at or before the maturity of said draft, either a warranty deed of fifteen undivided acres of land in eighty acres, being in section ten, near the termination of the canal from Chicago to Peru, Illinois; being the same fifteen acres of land he now owns; or shall, within said time last mentioned, execute, as aforesaid, a bond and mortgage to said Turner, for the payment of ten thousand dollars in eight years from the maturity of said draft, with annual interest, at seven per cent. Said mortgage to be upon unincumbered real estate to the satisfaction of said Turner." And Turner was to make his election within thirty days, whether he would take the fifteen acres or the mortgage. Now, if this draft had been given in payment as alledged by the complainant, and sworn to by his witness, would security have been given for the repayment of it? We may imagine why security should be required for the punctual payment of a draft, but if drawn in payment of a debt justly due, there is no possible combination of facts or circumstances which could render necessary a security for its repayment. This would be utterly inconsistent with the fact of payment. If paid in discharge of a just debt, of course it would not be required to be repaid.

. On the face of the draft Turner declared that he held himself individually responsible to the said Hubbard or his order, for the payment of it, agreeably to his covenant of that date executed to the said Hubbard. And it appears that Turner wrote to Mr. Webster, the same day the draft was drawn, requesting him not to pay it unless advised by him; as Hubbard was bound to give security for the repayment of the amount before the draft was due. And such is the condition recited above. From the condition it would seem that Turner had his option, whether to receive the Peru land in full for the draft on Mr. Webster, or, a mortgage on unincumbered property, for the payment of ten thousand dollars, and interest, at seven per cent., in eight years from the maturity of the draft. To avoid the condition of this assignment the complainant alledges that it was made on a paper disconnected with the mortgage of Hugunin and Pearce, and when drawn and executed it contained no such condition as it now contains, in regard to the Peru land, and the mortgage for ten thousand dollars in lieu of it, at the option of Turner. And it is alledged that the assignment, being in the hand-writing of Turner, he must have withdrawn it and substituted another with the above condition. This allegation charges on Turner a fraud of a most serious character, and which requires clear evidence to establish it. The answer denies this allegation of the bill. Greenwood, the plaintiff's witness, swears that there was no such condition as the above in the first assignment of the mortgage; but he admits that he was not present when the papers were executed. And Grant, another witness, the attorney of complainant, to whom the papers were submitted, also, states the assignment was without condition. This paper, with others, was acknowledged before Henry Brown, a justice of the peace, on the evening of the 10th of July, and the next morning Turner left the city. All the papers signed by Turner were left in possession of the complainant, this assignment among others, and he shortly afterwards handed them over to the recorder of deeds for the county, who recorded them.

The original assignment, as executed, is in evidence, and is identified and confirmed by the deposition of the justice of the peace before whom it was acknowledged. He took no acknowledgment of papers between Hubbard and Turner except at that time. There is no erasure or alteration on the face of this paper, and it contains the condition as above stated. The inference is, therefore, irresistible, that the witnesses, Greenwood and Grant, are mistaken. And if this paper be genuine, of which there would seem to be no doubt, the draft drawn on Webster was a loan to the complainant and not a payment. The transaction, it must be admitted, is out of the ordinary course

of business, but it is not more so than some other parts of the dealings between the same parties. The draft on Mr. Webster was not paid, nor was the mortgage executed by the complainant to secure its repayment. The answer of this inquiry makes the answer to the second easy, as to the manner in which the sum of eleven thousand dollars was paid by the complainant under the compromise. If the Peru land, at the option of Turner, was to be received for the draft on Mr. Webster, it could not have been applied as stated by Mr. Greenwood, the witness, as a credit of eight thousand dollars against the guaranty contract. The assignment of the Hugunin and Pearce mortgage shows that the draft was a distinct transaction, and was, in fact, a loan; and, if a loan, the Peru land could not have been offered as a discharge of it, if that land had been applied as contended for by the complainant. It must have been as free from the compromise as the unincumbered property on which the mortgage was to be executed, which Turner could demand in lieu of the Peru land. To make up the eleven thousand dollars the complainant charges three thousand dollars in addition to the sum of eight thousand for this land, on the ground that he settled the guaranty contract before it was due. That contract was entered into the 19th April, 1836, and it insured an advance of one hundred per cent. on the fifty four thousand dollar purchase in eighteen months. The compromise was made the 6th July, 1837, so that there was little more than three months of that contract to run. A charge of three thousand dollars for the payment, as settlement of this contract, in the manner in which it was settled, would have been a very extravagant and unjust charge. But the answer denies that any such charge was made by the complainant, or allowed in the compromise. And there is nothing in the evidence, or the circumstances of the case, which can overcome the answer. We are satisfied, therefore, that the payment of eleven thousand dollars was not made as insisted on by the complainant, but was, in fact, made by the application of the ten thousand dollar note, due 19th October, 1837, as set up in the answer of Turner. The interest on that note, up to the time it became due, being added to the principal, made the sum of eleven hundred and fifty dollars. This exceeded, by the sum of fifty dollars, the amount necessary to close the compromise; but this small sum was, probably, disregarded as the note was not due. The calculations seem not to have been made with much accuracy.

We come now to the third inquiry proposed, whether Turner was guilty of fraud. Were his representations in regard to the loan of twenty thousand dollars from Mrs. Ann Coultis fraudulent? The bill so charges. Now, from the evidence this loan seems to have been a transaction subsequent to the compromise. It was then not a part of it. On the 10th of July, 1837, Turner wrote to his father-in-law, Robert Campbell, that Hubbard was anxious to make a loan of twenty thousand dollars, for ten years, at seven per cent.; and, as the security was good, he thought it advisable to loan him, for Mrs. Coultis, the above sum, in case she had got returns, and had not made other disposition of her money. This lady, Turner represented, expected a large sum from England, and would, probably, receive it through Prime, Ward and King, of New York. On the above date Hubbard wrote to Mr. Campbell, saying, that Turner had made a conditional negotiation with him for a loan through Mrs. Coultis. And that if she should determine to loan him the amount, Hubbard requested Mr. Campbell to advise him of the fact. From these letters it appears that Turner did not make the loan, but pledged his influence and agency, so far as he could exercise them, to obtain the money. He did not know that the money had been received from England; and, if received, that it had not been loaned. And Hubbard's own letter shows that he expected to obtain the money only by the determination of Mrs. Coultis, as he requests Mr. Campbell to advise him, should she determine to loan the amount. It seems that Mrs. Ann Coultis received no money from England, and that Prime, Ward and King had not been advised on the subject. Mrs. Coultis had either been deceived herself, or was willing to practice an imposition on others, in regard to the money. But there is no evidence to sustain the allegation in the bill, that the representations, in regard to this loan, were made by Turner with the intent to defraud the complainant. His agency in the matter seems to have arisen from motives of friendship to Hubbard, and not with a view to defraud him. Turner was, no doubt, himself deceived as to the expectations of Mrs. Coultis. Had the loan been negotiated on the security designated, from the depreciation in the price of property, as proved in this case, Turner, with more propriety, might have been charged with a fraud against Mrs. Coultis. This part of the bill is not sustained. Strong representations were made by the defendant as to the solvency of Huntington and Campbell, and of J. P. Huntington, and that the four drafts drawn on them would be punctually paid; and he exhibited an authority to draw on them. The answer avers that these representations were true. It seems that the defendant had drawn drafts on the same persons to a large amount previously, all of which had been paid; and there is nothing in the evidence which shows that he had not reason to believe, when the above drafts were drawn, they would not be paid. His calculations, like the calculations of all speculators, made at the time, were not realized;

but the revulsion which took place in the price of property, and the general business of the country, seems not to have been foreseen by any one, much less by those who had yielded to the mania of the times. Under such circumstances a confident assurance of acceptance and payment of the drafts, by the drawer, followed by a failure to pay should not convict the drawer of fraud. That he was too confident in his expectation and assurances is shown by the result; but if this should make the transaction fraudulent, how can the complainant be sheltered from fraud in his confident representations of the great increase of the value of property sold by him to the defendant? In fact both parties partook, in a high degree, of the excitement of the times, and cherished the most visionary expectations of the future. But if the defendant had made fraudulent representations in regard to the payment of these drafts, how could that affect this case? It might waive the necessity of a demand and notice, but that only goes to the personal liability of the drawer.

The complainant prays that the deed from Russell and C. L. Hubbard may stand, and that so much of the property thereof may be sold as shall satisfy the balance due of the purchase money. Was the guaranty contract in the first instance, or as acted upon by the compromise, usurious or fraudulent? That the vendor should insure an advance of one hundred per cent. upon property sold in eighteen months seems to be extraordinary. And in ordinary times it would be. But when that contract was made a greater advance in less time was often realized by the purchaser. And when we look into the contract, and deduct the commissions allowed, the guaranty does not exceed much, if any, fifty per cent. These commissions amounted to the sum of twenty thousand three hundred dollars. And this sum, had the property advanced, as anticipated by the complainant, would have been to him a clear profit. That there was no usury in the transaction is manifest. There was no loan, either by the intention of the parties, or by the words of the contract. The sale was a bona fide one, and the guaranty contract was entered into by the complainant, as an inducement to the defendant to purchase; and, also, with the hope that it would yield a handsome profit. It seems that was not the first contract of the kind made by the complainant. And from his past experience he considered himself, no doubt, more likely to gain than lose by that one. But if there was any hardship in the contract, as at first made, there was none, to the complainant, as it was settled by the compromise. At the time of the compromise the defendant had paid to the complainant more than sixty four thousand dollars; and, in addition to this sum, he agreed to pay sixteen thousand three hundred eighty two dollars and ninety nine cents, for which sum drafts were drawn. The defendant received by the compromise a conveyance of lots, estimated to be worth fifty thousand dollars, and a bond and mortgage for the payment of twenty six thousand seven hundred dollars, making the sum of seventy six thousand seven hundred dollars. By the compromise he paid, and agreed to pay, a sum exceeding eighty thousand dollars. From this sum should be deducted any amount of moneys received by Hubbard, on sales of property covered by the thirty five thousand dollar contract, as agent of Turner; and for which he accounted in the compromise. But this deduction being made, would still leave the hardship of the compromise on the side of the defendant. A most extravagant estimate of value was placed upon the property conveyed to the defendant, and, also, on that which was mortgaged to him. The whole of this property is now believed to be worth less than one fourth of the sum at which it was valued. On the 30th of October, 1837, Turner assigned the above bond and mortgage to the Hon. Daniel Webster. This assignment is charged to have been fraudulent, but the answers and the evidence show that it was made for a good and valuable consideration. And Mr. Webster assigned the bond and mortgage the 12th January, 1838, to the bank of the United States. This assignment is, also, shown to have been bona fide, and for a valuable consideration.

And the question is raised by the complainant, whether the lots covered by this mortgage are not in the hands of the Bank of the United States, liable to the creditors of Turner, and to the payment of any amount that may be unpaid of the purchase money to the grantor. As there was no fraud in the assignments they must be held valid; and, of course, the general creditors of Turner can have no claim on the property. If a lien had been given on it, subsequently to the above mortgage, the asserter of such a lien might claim the right to pay off the first mortgage, and hold the land subject to his own lien. To this, it is presumed, the Bank of the United States, or its assignees, could have no objection, as the property is not now worth, probably, one fourth of the amount paid for it by the bank. Neither the bank nor Mr. Webster had any notice, at the time of the assignments, of any equitable lien upon the mortgaged premises. But, on general principles, the mortgagor may claim the same rights against the assignee of the mortgage as he could against the mortgagee. If he made a payment to the mortgagee, subsequently to the assignment, of which he has no notice, the payment shall be allowed against the assignee. And so if the mortgagor have any setoff or mutual credit against the mortgagee, it is not affected by the assignment. 2 Hov. Frauds, 133; Norrish v. Marshall, 5 Madd. 481; 2 Johns. Ch. 441, 479, 512.

But it is insisted that this general principle is controlled by an act of Illinois, passed the 3d January, 1827 [Rev. St. Ill. 124], "making promissory notes and other writings assignable." The first section provides that promissory notes, bonds, due-bills, and other instruments of writing, for the payment of money or property, shall be assignable by indorsement thereon, in the same manner as bills of exchange are, so as absolutely to transfer and vest the property thereof in the assignee, who is authorized to sue in his own name. By the fourth section, if the assignment be made before the instrument become due, the defendant is prohibited from giving in evidence the payment of any property or money before the assignment, unless he prove the assignee had notice of such payment at the time of the assignment. Nor, by the same statute, can the defendant set up a want of consideration, where the instrument was signed before it was due. The provisions of this statute are peculiar. They place every description of instrument, for the payment of money or property, in regard to its negotiability, on the same footing as a bill of exchange or promissory note. The language of the act is broad enough to include bonds and mortgages; and, if it embrace them, the mortgage under consideration having been assigned to Mr. Webster before the money secured by it was due, it must be held by him, and by the bank, as his assignee, free from the equity of the vendor. The drafts drawn on Huntington and Campbell, and J. P. Huntington, amounting to the sum of sixteen thousand three hundred eighty two dollars and ninety nine cents, remain unpaid; and the inquiry is now to be made, whether the lots, conveyed absolutely to Turner, amounting to fifty thousand dollars, on the compromise, shall be made subject to the payment of these drafts. That the property mortgaged, and now in the hands of the Bank of the United States, or its assignees, is not liable to this demand, has been shown. The property above conveyed, the 18th July, 1837, was mortgaged by Turner to Robert Campbell and Henry Scott, of the state of New York, in consideration of ninety thousand dollars. The condition expressed was, that the said Turner, his heirs, &c., shall pay to the said Campbell and Scott, their executors, &c., the above sum of ninety thousand dollars, with interest. A bond, corresponding with the mortgage, was executed at the same time, and, also, what purports to be a declaration of trust. This paper, after referring to the mortgage, declares that it was executed to the said Campbell and Scott in trust for the following purposes, and they are declared to be trustees. And they are directed to pay certain debts to individuals specified, amounting to thirty thousand four hundred and twenty dollars, out of the moneys first realized upon said mortgage. After making these pay-

ments, the trustees are to hold the mortgaged premises, in trust, to pay unto the Bank of Michigan the residue of the money realized from the premises, should the mortgagor owe that amount to the bank. Any balance over that indebtment was directed to be paid to the Bank of the United States on Beardsley's acceptances. The mortgage was acknowledged the 19th of July, left for record the 25th, and recorded the 10th August, 1837. To the execution of the declaration of trust there was no witness, and it has not been recorded. And here a question arises, whether a declaration of trust is valid, under the statutes of Illinois, it never having been recorded.

By the 8th section of the act concerning conveyances of real property, passed 31st January, 1827 [Rev. St. Ill. 129], it is provided that every deed conveying real estate, which by any other instrument shall appear to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage; but no benefit can be claimed under such defeasance, or other writing, unless it be recorded within thirty days after the deed shall have been recorded. By the 15th section of the same act, all grants, bargains, sales, leases, releases, mortgages, defeasances, conveyances, bonds, contracts and agreements of, and concerning, lands, or whereby the same may be affected in law or equity, shall be recorded; and if not proved and recorded in twelve months, it shall be adjudged fraudulent and void against any subsequent bona fide purchaser. And, afterwards, in the act abolishing the office of state recorder, approved January 18, 1833 [Rev. St. Ill. 587], it was provided, in the 5th section, that, after the first day of August next, all deeds and other title papers, which are required to be recorded, shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void, as to all such creditors, &c., until the same shall be filed for record in the county where the lands lie. The 7th section of the same act repeals all former laws on the same subject.

The defendant insists that the 8th section, above cited, can only apply where the deed is absolute upon its face, which is not the case under consideration. That the deed to Campbell and Scott is conditional, requiring the payment of ninety thousand dollars by Turner. Scott, it seems, was a creditor to the amount of about four thousand dollars, and this, aside from the declaration of trust, was the only consideration on which the mortgage was given. This sum, however, is not stated in the mortgage, nor is there any reference to it. The consideration named is ninety thousand dollars, and that is the amount which Turner bound himself to pay

to the mortgagees. Now, such a transaction by an individual embarrassed, having no other foundation than the sum of four thousand dollars, would be held fraudulent against creditors. It would have the appearance of an attempt to place a large amount of property, under the pretence of paying a small sum, beyond the reach of creditors. The 15th section, it is contended, applies only to subsequent purchasers. This must be admitted, looking only to the provisions of that section. But the fifth section of the act of 1833 declares, that all deeds and other title papers, required to be recorded, shall take effect only from the time of filing such papers for record. And such papers are declared to be void against creditors, until they shall be recorded. Now, is this declaration of trust, a paper, which the law required to be recorded? The 8th and 15th sections of the act of 1827, above cited, would seem to leave no doubt upon this point. The inquiry is not what is the effect, under either of these sections, if the paper be not recorded, but does either of them require it to be recorded? In this respect the provision of the 15th section is as broad as words can make it. All grants, bargains, sales, leases, releases, mortgages, defeasances, conveyances, bonds, contracts, and agreements of, and concerning lands, are required to be placed upon the record. The 8th section is equally comprehensive, though less explicit. And if these sections, or either of them, embrace this declaration of trust, the 5th section of the act of 1833, declares, that it shall have no effect against creditors until recorded. Is not the complainant a creditor? As vendor he stands in the most favored relation of a creditor. He has a lien upon the land sold for the whole or any part of the purchase money that remains due. And this lien may be enforced against any purchaser of the land with notice.

The argument that because one condition is expressed in the mortgage deed, the other conditions expressed on a separate paper, and on which, only, the deed could be held bona fide, need not be recorded, can not be sustained. It can not be sustained under the 8th section. The mortgage deed does not show the trust. It purports to secure a debt of ninety thousand dollars due to the mortgagees. There is no intimation that this large sum of money is to be held or applied for the benefit of others. There is no such trust apparent or implied from the deed. Now, what is the object of a defeasance? Is it not to show the nature of the contract? If a trust be created it shows the character and extent of it. And this is shown by the declaration of trust under consideration. Does not the 8th section require such a paper to be recorded? Does it not essentially affect the deed of mortgage. By the deed the money would seem to belong to the mortgagees. But the declaration shows they hold it in trust for certain creditors.

The eighth section should not be so construed as to require a declaration of trust to be recorded, only, when it is connected with an absolute deed. The spirit and policy of the provision equally applies to a declaration of trust which materially affects the deed; which, in fact, gives a different effect to the deed from what its words import. Such a paper is as much within the law as if it were connected with an absolute deed. In both instances it modifies the deed. It creates rights which are not found in the deed. How then can the same paper, producing the like effect in both cases, be held to be within the law in the one case and not in the other? Notice, which the law intended, is necessary in both cases. But without relying upon the eighth section the paper comes clearly within the provisions of the fifteenth section. This is sufficient. It takes no effect until filed for record, as against creditors.

The defendant insists that the complainant has an adequate remedy at law. And that suits of attachment are now pending which will give him full relief. The ninety thousand dollar mortgage is a sufficient ground for an equitable jurisdiction. Until the apparent lien under that instrument shall be set aside, or postponed, no part of the property covered by it could be safely purchased. There are other considerations arising out of the case which go to sustain the jurisdiction of the court. But little attention seems to have been paid to the mode of proceeding in this case, or to the citizenship of the parties. New matters are set up in the answer to operate as a cross-bill, and to these, answers are filed by new parties. This is the course of practice in Kentucky, and in some of the other states, but it is not the established English practice. And this court and the supreme court are governed, in chancery, by the English practice. A crossbill is filed to bring more fully before the court a subject matter connected with the case made in the bill, and which is necessary to a determination of the controversy. The necessity of a crossbill may arise as well between two defendants as between one or more defendants and the complainant. Mitf. Pl. 81. There is an instance in the case of Fife v. Clayton, 13 Ves. 546, 15 Ves. 525, where a court of chancery, contrary to the old practice, gave the benefit of a crossbill to a defendant upon his answer. But this seems to be a departure from the general rule. Hind, Pr. 54; 1 Atk. 21. In this case there are no matters set up in the answers referred to, perhaps, that would not be appropriate to the matter of the bill, or might be used as depositions on the hearing. In a case which interests so many parties as this one, and embraces so many, and complicated facts and circumstances, mere form should, as far as possible, be dispensed with.

The pleadings should always state the citizenship of the parties to show the jurisdic-

tion of the court. As between citizens of the same state the court can exercise no jurisdiction. The complainant is a citizen of Illinois, and Turner, the defendant, is a citizen of New York. But where several of the other defendants reside is no where stated. If any of them are citizens of Illinois the court can have no jurisdiction between them and the complainant. By the act of the 28th February, 1839 [5 Stat. 321], the jurisdiction of the court is extended in certain cases, but that act has no application to the parties in this case. As between the plaintiff and citizens of states, other than Illinois, the court may exercise jurisdiction, where the defendants voluntarily file their answers, as has been done in this suit. The money sought to be recovered by the complainant is due to him and others for whom he is agent. He acted under a power of attorney which authorized him to sell and convey the property, and in all other respects to act in the premises. The unpaid drafts were drawn in his favor, and his interests are mixed up with the others. Under the circumstances, we think, the suit may be well sustained in the name of the complainant, in the form which he has brought it. The history of the present case affords a striking exemplification of the ruin which generally follows a most extravagant and visionary estimate as to the value of property. Under such circumstances the judgment seems to be overthrown, and dreams of imaginary wealth take possession of the mind. It is, indeed, a species of madness, from the influence of which but few are exempt.

The property purchased by the defendant is not now worth, perhaps, one fourth the amount which he either paid or agreed to pay for it. But this is a hardship for which the law can give no relief. Whether the value of property shall advance or decline is a matter of calculation and risk by the vendor and purchaser. The law can only look at the contract. If it has been fairly entered into, it fixes the rights of the parties, and the rule for the action of the court. As against the claim of the vendor for the residue of the purchase money, on the property conveyed to Turner, the mortgage executed by him can afford no protection beyond the demand of Scott the mortgagee. The declaration of trust not having been recorded, under the statutes of Illinois, is inoperative against creditors. And the complainant must be viewed in the light of a favored creditor.

The court will decree the sale of so much of the property conveyed to Turner, by the complainant, for himself, and as agent, in July, 1837, as shall pay the residue of the purchase money. The property to be sold in lots, after giving —— days notice, as the rule requires, and agreeably to the requisites, and subject to the conditions, of the laws of the state. The sale to be subject to the lien of Scott, under the mortgage, for the amount due him, which amount shall be first paid from moneys realized by the sales. And a reference is made to the master to ascertain that amount, and the amount of the four drafts drawn on Huntington and Campbell, and J. P. Huntington, including interest, damages, and costs of protest. From this amount he will deduct the amount of the mortgage of Hugunin and Pearce, unless the same shall have been reassigned to Turner. This mortgage was assigned to secure the payment of the draft on Mr. Webster, but the complainant failed to give the security which he was bound to do before the maturity of the draft for its repayment, and he was, consequently, not entitled to the proceeds of the draft. The amount of the above mortgage must, therefore, be accounted for by the complainant, by deducting it from the balance of the purchase money due.